IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

JAMES A.,

        Plaintiff,

v.                                 Civil Action 3:22-cv-207
                                    Judge Michael J. Newman
                                    Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, James A., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.**        **BACKGROUND**

On October 14, 2019, Plaintiff protectively filed an application for DIB alleging disability beginning March 1, 2018. (R. at 155–61). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on December 22, 2020. (R. at 33–60). The ALJ denied Plaintiff's application in a written decision on December 31, 2020. (R. at 14–32). When the Appeals Council denied Plaintiff's request for review, that denial became the final decision of the Commissioner. (R. at 1–6).

Next, Plaintiff brought this action. (Doc. 1). As required, the Commissioner filed the administrative record (Doc. 8), and the parties briefed the issues (Docs. 9, 10, 11). The matter is ripe for review.

### A. Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as well as his statements to the agency:

[Plaintiff] alleged disability due to a bulging disc with chronic back pain, COPD, bronchitis, and emphysema (Exhibit 2E; Disability Hearing). He testified his lower back pain and other symptoms are unchanged since 2019 and his doctor has recommended nerve ablation. He affirmed that he is not interested in the nerve ablation procedure nor the spinal cord stimulator (SCS) and has no intentions to schedule either procedure. He testified he is not interested in the SCS because his wife had the SCS and had to have multiple surgeries for that device and [Plaintiff] does not "want to be cut up anymore." He testified he is not sure he wants to undergo nerve ablation because the spinal surgery was supposed to improve his back symptoms "but it didn't do the job."

[Plaintiff] testified his doctor provided him inhaler for his COPD that he uses once daily, even though his insurance did not cover the prescribed inhalers. He testified he continues to smoke tobacco and marijuana. He testified he experiences shortness of breath about 85-90% of the daily each day, which is triggers by smells and cold. He testified he uses his inhaler twice a day on good days and 6-8 times on bad days. He testified he uses a nebulizer and the frequency of the nebulizer use increases during the winter.

He testified he has very bad left leg pains and can only walk half a block, he does not use a cane or other assistive device, he could stand only 5-10 minutes, and he could sit only 5-10 minutes. He initially testified he is not prescribed any pain medications and does not take any over-the-counter pain medications, but later testified he takes gabapentin and muscle relaxers that do not provide much relief. He testified he has not been prescribed any further physical therapy. He testified he lives in a house with his wife, he could climb stairs with a railing, perform household chores but it takes him time, and grocery shops twice a week. He testified he could carry grocery bags up to 10 pounds, and he is limited in lifting because of his recent hernia surgery.

[Plaintiff] testified his back pain is constant and radiates down to his foot. He testified he feels pain at the ball of his foot, which makes him stumble and fall occasionally (a couple times a month). He testified his pain inhibits him from sleeping and he sleeps an average of 7 hours a night.

(R. at 21–22).

### B. Relevant Medical Evidence

The ALJ also discussed Plaintiff's medical records and symptoms:

The physical examinations evidenced some abnormal findings that are consistent with [Plaintiff]'s severe impairments, including bilaterally diminished breath sounds throughout, wheezing, decreased range of motion of the lumbar spine with tenderness and pain of the left lower area, muscle spasms, radiating pain in the left leg, and decreased extension of the left knee and dorsiflexion of the left ankle (Exhibits 1F-14F).  However, the vast majority of the examinations documented findings do not support [Plaintiff]'s allegations of symptom severity or functional limitations, including no distress, clear lungs to auscultation, normal pulmonary effort, normal breath sounds, no wheezing, rhonchi or rales, oxygen saturation of 91-96%, nontender extremities without edema, full strength in all extremities, normal and stable gait without use of an assistive device, and non-focal neurological examinations (Id.).  At the physical examination in October 2020, [Plaintiff] exhibited good range of motion of all major joints without tenderness to palpation, no tenderness of the back, clear chest, no wheezes, rales or rhonchi, normal blood pressure, no acute distress, and no focal neurological deficits (Exhibit 11F).  Additionally, [Plaintiff] denied shortness of breath, myalgias, tingling, weakness, numbness, and/or paresthesias at some examinations (Exhibits 2F, 5F, 7F, 8F, 11F, 12F, 13F).  At the primary care visit in July 2020, [Plaintiff] wore a mask secondary to the current pandemic and initially appeared short of breath; however, Alexandra Starkey, PA-C clinically noted [Plaintiff] "was fine without notable SOB" when he removed his mask for a few minutes" (Exhibit 8F).

\*\*\*

Diagnostic imaging studies revealed abnormal findings that are consistent with [Plaintiff]'s severe impairments, but do not support his allegations regarding the severity of symptoms or limitations in his daily functioning, especially when compared to prior diagnostic imaging studies and when evaluating the degree of the abnormal findings with improvements in symptoms from the prescribed treatments discussed below (Exhibits 1F, 3F-5F, 7F, 8F, 12F, 14F).  The lumbar spine MRI from August 2019 revealed interval postsurgical changes from the February 2019 S1-S2 hemilaminectomy for decompression and repair of the Tardov's cyst, minimal to mild disc bulges at L3-L4 and L4-L5, a few Schmorl's nodes, and a decrease in size of the sacral cyst compared to the MRI findings in 2018 (Exhibit 14F).

Although the Chest CT obtained in May 2019 reviewed mild to moderate centrilobular emphysema, the lung nodules found in 2017 were unchanged and the pulmonologist did not diagnose [Plaintiff] with emphysema (Exhibit 1F, 3F; See also Exhibit 4F).  By November 2019, the lesions decreased in size and the CT scan showed only mild emphysematous changes (Exhibit 4F).  The chest x-rays and chest CT scans revealed no acute pulmonary processes (Exhibits 1F, 4F-7F).

[Plaintiff] had a PFT in June 2019 revealed moderately severe obstructive pattern with air trapping, but diffusing capacity was normal and the clinical notes on the PFT state [Plaintiff] was unable to produce acceptable and reproducible spirometry

3

data and he did not complete the FRC (Exhibits 1F, 3F, 7F).  The clinical records note he had been smoking a pack of cigarettes daily for the past 32 years (Exhibit 1F).  Although [Plaintiff] expressed interest in quitting smoking, in January 2020, Lori Zwickel, PA-C clinically noted the examination "room smells strongly of cigarette smoke" (Exhibit 6F).

[Plaintiff] alleged disability due in part to bronchitis, but the medical evidence of record shows only two cases of bronchitis since his alleged onset date of disability, and the third diagnosis of bronchitis (October 2020) is not supported by the examination[] findings, especially when those records state, "No exacerbation at this time." (Exhibit 8F; See Exhibits 1F-14F).

While [Plaintiff] reported continued postsurgical pain after February 2019, the symptoms improved and it appears his neurosurgeon released him from treatment in June 2019 and his primary care physician explained in August 2019 that the MRI showed multiple mild disc bulges but "there is no surgical issue" (Exhibits 2F, 14F).  The neurosurgeon had explained at the June follow up visit that if the cyst reappeared but was a lot smaller, than [Plaintiff] would be a candidate for a spinal cord stimulator (Exhibit 14F).  [Plaintiff] had refused a spinal stimulator (See Exhibit 6F; Disability Hearing).  [Plaintiff] also refused referrals to a physical medical and rehabilitation physician and to physical therapy in August 2019, opting for a referral to pain management (Exhibit 2F).

However, he did not present to a pain management consultation, but instead presented for neurology evaluations in February 2020 and Rani Nasser, MD recommended a spinal cord stimulator (Exhibits 13F).  [Plaintiff] received another referral to pain management in March 2020.  There is no evidence of ongoing evaluations and treatments with a pain management specialist (Exhibit 6F).  He switched primary care physicians in June 2020 and that Alexandra Starkey, PA-C offered a referral to pain management in July 2020, but [Plaintiff] refused (Exhibit 8F).

Other prescribed treatments included inhalers, nebulizer, Medrol Dosepak, opioid and nonopioid pain medications, muscle relaxers, and trazadone to help him sleep (Exhibits 1F-4F).  With the use of prescribed treatments and follow up examinations, [Plaintiff] experienced improvements in symptoms, signs, and functioning (Id.).  He required adjustments to medication regimen and/or doses, and referrals to specialists, but changes in prescribed treatments and referrals to specialists are not dispositive of disability, as the regulations require claimants to seek examinations and comply with prescribed treatments that could alleviate symptoms and improve functioning.  With the improvements seen in the November 2019 chest CT scan, his pulmonologist instructed him again to stop smoking, prescribed inhalers, and instructed him to obtain a chest CT in one year (Exhibit 4F, 5F, 7F, 12F).  In July 2020, [Plaintiff] reported that he was only utilizing albuterol inhaler because his insurance did not cover the other prescribed inhalers, but he endorsed the helpfulness of albuterol (Exhibit 8F).  Based on the July and

4

> September 2020 primary care records, [Plaintiff] was not receiving new prescriptions for albuterol inhalers and he had gaps in use of gabapentin and Robaxin (Id.).
>
> Additionally, despite the cyst in his lower back, radiculopathy, COPD, shortness of breath when climbing stairs, and increased use of his inhaler in cold weather, clinical records from January 29, 2019 state [Plaintiff] was "active at home doing most of [sic] housework, cooking, shopping and taking care of a 3 year old child." (Exhibit 1F). ***

(R. at 22–24).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through June 30, 2023, and has not engaged in substantial gainful activity since March 1, 2018, the alleged onset date. (R. at 19). The ALJ determined that Plaintiff has the following severe impairments: lumbar spine degenerative disc disease, lumbar radiculopathy status post-laminectomy, chronic obstructive pulmonary disease (COPD). (*Id.*). Still, the ALJ found that Plaintiff's impairments, either singly or in combination, do not meet or medically equal a listed impairment. (R. at 20).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ concluded:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could frequently balance; only occasionally climb, stoop, kneel, crouch, or crawl; never use ladders, ropes, or scaffolds; must avoid concentrated exposure to extreme temperatures, humidity, fumes, and dust; never use foot controls with the left lower extremity; must avoid unprotected heights, but is capable of avoiding ordinary workplace hazards.

(*Id.*).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. at 22).

Relying on the vocational expert's testimony, the ALJ found that Plaintiff is unable to perform his past relevant work as a lubrication technician, material handler, a grounds keeper, a

5

machine repairer, cashier/stocker, and a box machine operator. (R. at 25). However, considering his age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform at the light exertional level, such as an information clerk, order clerk, or nut/bolt assembler; and at the sedentary exertional level, such as a nut sorter, final assembler or bench hand. (R. at 26–27). The ALJ therefore concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since March 1, 2018. (R. at 27–28).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

In his Statement of Errors, Plaintiff says the ALJ failed to properly evaluate the

6

supportability of the state agency reviewers' administrative findings and the medical opinion provided by Alexandra Starkey, PA-C. (Doc. 9 at 5–9). The Commissioner says the ALJ appropriately addressed supportability, as well as consistency, in her consideration of the administrative findings and opinion. (Doc. 10 at 7–13). For the reasons that follow, the Undersigned finds Plaintiff's assignment of error without merit.

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id*. *See also* 20 C.F.R. §§ 404.1513(a), 404.1520c (2017).

The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1]  20 C.F.R. § 404.1513(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 404.1513(a)(2), (5).

7

claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." § 404.1520c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. 20 C.F.R. § 404.1520c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. 20 C.F.R. § 404.1520c(b)(2).

Thus, the role of the ALJ is to articulate how she considered medical opinions and how persuasive she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The role of the Court is not to reweigh the evidence, but to make sure the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence. *Id.*, at *14.

When evaluating the opinions of the state agency reviewing physicians, the ALJ determined:

> The undersigned considered the opinions of state agency medical consultants Douglas Chang, MD and Indira Jasti, MD and finds their assessment that [Plaintiff] could perform work activities within the light exertional level is persuasive, as their opinion is generally consistent with the objective physical examination findings, the diagnostic imaging study results, and the PFT results discussed above (Exhibits 1A, 4A). However, evidence received at the hearing level supports greater limitations with balance and kneeling, exposure to cold, and exposure to hazards. Specifically, PFT results and [Plaintiff]'s inability to obtain his other prescribed

8

>inhalers would preclude work involving concentrated exposure to extreme temperatures, including cold. Given the MRI findings, the decreased extension of the left knee and ankle finding, his lack of use of an assistive ambulatory device, and his infrequent refills of albuterol, he would be limited to frequent balancing and occasional kneeling, but he would not be precluded from work around all hazards as Dr. Chang and Dr. Jasti opined.

(R. at 24).

Plaintiff says the ALJ merely "found the opinions either consistent or inconsistent with the overall medical record, which only addresses the consistency factor." (Doc. 9 at 7). In other words, Plaintiff says, to adequately address supportability "the ALJ needed to evaluate what these sources said they each based their opinions on—not simply how the opinions compared to other record evidence . . . ." (Doc. 11 at 2). However, the Undersigned finds that the ALJ did evaluate the sources the reviewers based their opinions on.

At the outset, the Undersigned notes the inherent lack of clear delineation between supportability and consistency when an ALJ evaluates the opinion of a reviewer—like a state agency physician—who forms her opinion after a holistic review of the medical evidence of record. Consider, for example, a case in which there has been little or no change to the medical evidence of record between the time the reviewer issues her finding and the ALJ conducts a hearing. In that instance, the evidence upon which the reviewer supported her finding—the complete medical record at the time of her finding—would be virtually identical to the evidence with which the opinion is consistent or inconsistent—the complete medical record at the time of the ALJ's hearing. The ALJ is left in a position in which she is unable to consider supportability without simultaneously addressing consistency, and vice versa. A plaintiff might semantically allege error in such a case—saying that the ALJ only addressed consistency because she compared the reviewer's opinion to the entirety of the record. But the ALJ would have still fulfilled the purpose of the regulation: to give a fulsome review to medical opinions and prior administrative

9

findings, paying particular attention both to how the opinions are internally supported and explained, and how they compare to the record as a whole.

Contrast this with a medical opinion rendered by a treating physician. There, supportability and consistency are more clearly distinguished. The physician supports her opinion with her own treatment notes, objective medical findings, and experience with the plaintiff. Her opinion is consistent (or not) with the entire universe of the medical evidence of record.

Other courts in this Circuit have considered this facet of the supportability/consistency framework. In *Vaughn v. Commissioner of Social Security*, the Western District of Tennessee addressed an allegation that an ALJ had not properly assessed the supportability of opinion evidence provided by a physician acting as a "reviewing specialist[ ] . . . ." No. 20-cv-1119-TMP, 2021 U.S. Dist. LEXIS 134907, at *24 (W.D. Tenn. July 20, 2021). The court found that consistency had sufficiently been addressed by the ALJ, because she explicitly detailed why the opinion was inconsistent with other aspects of the record. *Id.* at *25–27. But, the ALJ had not meaningfully discussed supportability. *Id.* at *27–32.

Notably, however, the physician based his opinion on other medical records "he reviewed, which completely encompasse[d] the relevant period of discovery." *Id.* at *30–31. In other words, the physician operated in the manner of a state agency reviewer, conducting a holistic review of the medical evidence of record before rendering an opinion. So, the court determined that while the ALJ had not observed 20 C.F.R. § 404.1520c to the letter, she had:

> achieved the regulations' goal of providing notice to [the plaintiff] of why [the physician's] opinion was not persuasive. [The physician]'s opinion was entirely predicated on a review of [the plaintiff]'s medical history and, when recounting that same medical history, the ALJ identified several instances where [the plaintiff]'s medical records did not support a finding of disability. As such, the ALJ's discussion of [the plaintiff]'s medical history is, in essence, a discussion of whether the evidence [the physician] reviewed could actually support his conclusions. Thus, while not being a direct attack on the supportability of [the physician]'s opinion as

10

> contemplated by the regulations, the ALJ's opinion is only one step removed from articulating why she believed the basis for [the physician]'s opinion was faulty, i.e. an explanation of the supportability factor.

*Id.* at *34–35. Accordingly, the court concluded that any error in the assessment of the opinion was harmless and remand was not necessary. *Id.* at *36.

This same harmless-error analysis should apply to an ALJ's decision which clearly discusses the consistency of a state agency reviewer's opinion, when that same opinion was formed upon records which encompassed the relevant period of discovery and the ALJ elsewhere discusses those records in detail. Nonetheless, in the present case—because the record had developed from the time the state agency reviewers rendered their opinions to the time of the hearing—it is clear from the ALJ's explanation how the supportability and consistency of the opinions were separately considered.

Regarding supportability, the ALJ particularly referenced records upon which the state agency reviewers based their opinions: "the objective physical examination findings, the diagnostic imaging study results, and the PFT results discussed above." (R. at 24). Though she used the word "consistent" to describe the relationship between the reviewers' conclusions and the supporting medical records, she was functionally describing supportability and the opinions' "reference to diagnostic techniques, data collection procedures/analysis, and other objective medical evidence." *Mary W. v. Comm'r of Soc. Sec.*, No. 2:20-cv-5523, 2022 WL 202764, at *8 (S.D. Ohio Jan. 24, 2022) (citing *Reusel v. Comm'r of Soc. Sec.*, No. 5:20-CV-1291, 2021 WL 1697919, at *7 n.6 (N.D. Ohio Apr. 29, 2021)). For instance, among the diagnostic imaging referenced by the ALJ, Dr. Chang (R. at 66) and Dr. Jasti (R. at 73) each referenced Plaintiff's August 21, 2019 MRI, which showed "multiple mild disc bulges[,]" (R. at 66, 73) and "indicate[d] mild DDD and [history] of back surgery" (R. at 75); the ALJ similarly described that MRI, noting that the mild disc bulges presented "no surgical issue" (R. at 23) (quoting R. at 287). Regarding

11

the PRT tests, Dr. Jasti referred to Plaintiff's June 6, 2019 breathing test, which was "consistent with a moderately severe obstructive pattern with air-trapping[,]" (R. at 73) and "indicate[d] breathing difficulties" (R. at 75); the ALJ noted the same (R. at 23) (citing R. at 335). Dr. Jasti also discussed chest CT scans from 2019 which exhibited mild to moderate emphysema, showed a left lobe lesion that was unchanged in size over two years and therefore likely benign, and revealed no acute pulmonary process (R. at 73); the ALJ discussed the same evidence in detail (R. at 22–23) (citing R. at 242, 257–58, 340–41, 344–45). At base, the ALJ identified particular objective evidence upon which the reviewers formed their opinions, and elsewhere discussed in detail why that evidence was significant to Plaintiff's RFC.

Regarding consistency, the ALJ identified parts of the medical record outside of the reviewers' consideration with which the opinions were inconsistent. The ALJ noted, "evidence received at the hearing level supports greater limitations with balance and kneeling, exposure to cold, and exposure to hazards." (R. at 24). In particular, she referred to Plaintiff's inability to obtain certain prescribed inhalers, which she believed "would preclude work involving concentrated exposure to extreme temperatures, including cold." (R. at 24). Elsewhere, she described that in July 2020—two months after Dr. Jasti issued the state reconsideration finding—Plaintiff "reported he was only utilizing albuterol inhaler because his insurance did not cover the other prescribed inhalers . . . ." (R. at 23–24) (citing R. at 456). Similarly, she found that the state agency reviewers' opined limitation that Plaintiff should not work around hazards (such as heights) was unnecessary, in part due to Plaintiff's lack of use of an assistive ambulatory device. (R. at 24). She elsewhere noted that this was confirmed by Plaintiff's testimony at the disability hearing. (R. at 21, 25). Said differently, the ALJ compared the opinions of the state agency reviewers to

12

other evidence in the record—she therefore addressed consistency, and distinguished her earlier consideration of supportability.

All told, regarding the findings of the state agency reviewers, the ALJ properly considered both supportability and consistency, and supported her conclusion with substantial evidence. There was thus no error in her treatment of the findings.

When evaluating the opinion of Ms. Starkey, the ALJ determined:

> The undersigned considered the December 2020 medical source statement of Alexandra Starkey, PA-C and finds it not persuasive, as it is not supported by the physical examination findings within the primary care records and is not consistent with the physical examination findings within the other clinical records nor consistent with the diagnostic imaging studies of the lumbar spine or the PFT results (Exhibit 15F). Specifically, the abnormal objective findings within the medical evidence of record discussed above do not support the severity of exertional limitations Ms. Starkey opined nor the feeling, visual, hearing, or hazard limitations she opined. Ms. Starkey's primary care examination in September 2020 was generally normal and those clinical treatment records did not note an active treatment plan aside from Robaxin (Exhibit 8F). Ms. Starkey noted [Plaintiff] had not exhausted all his treatment options (Id.). Given [Plaintiff] still declines the radiofrequency ablation and spinal stimulator treatments and her prior and subsequent examinations did not evidence sufficient abnormal findings to support her December 2020 medical source statement, the primary care records and other treatment records do not contain objective evidence to support Ms. Starkey's opinion of [Plaintiff]'s significant exertional limitations. Notably, Ms. Starkey based her indication of a hearing limitation only on [Plaintiff]'s subjective statement without objective evidentiary support. She only noted that he wears prescription lenses in explaining that he has visual limitations, without identifying an impairment that was not improved by the glasses (Id.). Furthermore, [Plaintiff] does not use an assistive device to ambulate or for balance, nor did Ms. Starkey or any physician find it necessary to prescribe one (Disability Hearing).

(R. at 24–25).

Again, Plaintiff says the ALJ primarily addressed only the consistency of Ms. Starkey's opinion with the record as a whole. (Doc. 9 at 8). Plaintiff concedes that the ALJ considered supportability when she noted that Ms. Starkey's opined hearing limitation was based only on Plaintiff's subjective statement and no objective evidence, and that her opined visual limitation

13

was based only on the fact that Plaintiff wore prescription eyeglasses, without identifying an impairment that was not corrected by the eyeglasses. (*Id.*). Yet, he says that "Ms. Starkey opined on much more than just [Plaintiff]'s hearing and visual limitations[,]" and more supportability analysis was required. (*Id.*). The Undersigned finds the ALJ's discussion of both supportability and consistency sufficient, and her conclusion supported by substantial evidence.

Regarding supportability, Plaintiff has already conceded that the ALJ did address supportability directly. But to the extent he argues the ALJ needed to do more—she did. In fact, the ALJ referred several times to Ms. Starkey's own primary care notes. (R. at 25) (citing R. at 433–64). Specifically, she noted that Ms. Starkey's primary care examination in September 2020 was "generally normal . . . did not note an active treatment plan aside from Robaxin[,]" and Plaintiff refused to pursue radiofrequency ablation and spinal stimulator treatments. (R. at 25); (*see* R. at 452) (noting Robaxin would be used to treat "[c]hronic left-sided low back pain with left-sided sciatica" but that Plaintiff "declines to have RFA and spinal stimulator."). Further, she noted that Ms. Starkey's prior and subsequent examinations did not support the opined exertional limitations. (R. at 25); (*see, e.g.,* R. at 458) (July 2020 exam noting for same back pain and sciatica that Ms. Starkey "[d]iscussed that UC recommended spinal stimulator but [Plaintiff] isn't interested. Offered to refer him to pain management but he declined."). Accordingly, the ALJ found that Ms. Starkey's opined exertional limitations, many of which stemmed from alleged numbness in Plaintiff's left leg radiating from his back pain, were not well-supported by her own treatment notes and objective examination findings.

Regarding consistency, the ALJ noted that Ms. Starkey's opined limitations were not consistent with other physical examination findings, diagnostic imaging of the lumbar spine, or PFT results, all of which the ALJ—as described above—discussed in detail. (R. at 24). And, as

14

with the state agency reviewers' findings, the ALJ noted that Ms. Starkey's opined limitation that Plaintiff could not work around hazards was inconsistent with Plaintiff's own testimony that he never used an ambulatory assistive device. (R. at 25).

So, regarding the medical opinion of Ms. Starkey, the ALJ properly considered both supportability and consistency, and supported her conclusion with substantial evidence. There was thus no error in her treatment of the medical opinion.

### IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 9) and **AFFIRM** the Commissioner's decision.

### V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of

15

the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

      IT IS SO ORDERED.


Date:  March 14, 2023                                 /s/ Kimberly A. Jolson
                                                         KIMBERLY A. JOLSON
                                                         UNITED STATES MAGISTRATE JUDGE